Shirley **HERMAN**, as Administratrix of the goods, chattels and credits which were of Samuel Herman, deceased, Plaintiff,

v.

**EASTERN AIRLINES**, Inc., Defendant.

Civ. No. 12434.

United States District Court
E. D. New York.

Feb. 7, 1957.

Harry H. Lipsig, New York City, Emil Reich, New York City, of counsel, for plaintiff.

Bigham, Englar, Jones & Houston, New York City, Reilly & Reilly, New York City, of counsel, for defendant.

GALSTON, District Judge.

This action was removed by the defendant from the state court on the ground of diversity of citizenship.

There are two causes of action alleged in the complaint.

As to the first cause of action, it is said that Samuel Herman, a resident of Kings County, was a passenger on a plane owned and operated by the defendant; that the plane was caused to crash land on July 17, 1951 as a result of the carelessness and negligence of the defendant near the Charles River in the vicinity of Richmond, Virginia; that as a result of the defendant's negligence, plaintiff's intestate was severely and seriously injured, bruised and wounded, and suffered great physical and mental pain, and became sick, sore and disabled. In the prayer in this first cause of action, the plaintiff's intestate is alleged to have suffered damage in the sum of $100,000.

The second cause of action alleges that as a result of the injuries which Herman sustained he died, on November 24, 1951.

It is alleged that the laws of the State of Virginia determine the rights of the plaintiff.

The answer denies all allegations relating to carelessness or negligence, and sets up, as a first defense, that the Wrongful Death Act of the State of Virginia, referred to in the complaint, limits a recovery to $15,000 in the event of proved liability of the defendant, and also alleges that the aircraft operated by the defendant was not in the exclusive management or control of the defendant, but was subject to and under the control of the United States, and that the decedent knew or should have known that he traveled subject to the risks and perils of the air, over which the defendant had no control, and that the emergency landing of the aircraft resulted solely from the risks and perils over which the defendant had no control.

It is clear then that the issues in the case may be briefly recited as follows:

(1) Was the decedent injured in the emergency crash landing?

(2) Did he die as a result of the crash landing?

(3) Was the injury, if any, which decedent sustained due to the negligence of the defendant?

(4) Was the death of the decedent due to the negligence of the defendant?

(5) What was the liability, if any, pursuant to the laws of the State of Virginia in respect to the alleged causes of action?

Prior to the trial of the action the plaintiff required the defendant to answer certain written interrogatories. From the answers thereto, it appears that Samuel Herman was a paying passenger on the flight in question; that the captain of the airplane was John B. Armstrong, the pilot William C. Davis and the engineer David B. Lane; that the log of the flight was furnished. Interrogatory No. 15 required an answer to the question: "State what a hydraulic reservoir access door was on the said aircraft on Flight 601 on July 19, 1951." The answer was: "An access door being a hinged door approximately nine inches wide and fifteen inches long with four latches." The four latches were of the spring loaded type, opening manually. Their condition was good, and at the time of the examination thereof, on July 19, 1951, their condition likewise was found to be good. Additional interrogatories and answers are referred to later on in this opinion.

According to the testimony, on July 19, 1951, plaintiff's intestate boarded defendant's plane, a four-engined Constellation, at Newark, New Jersey, for a flight to Miami, Florida. About an hour after the take-off, the flight encountered a severe hail storm. The turbulence caused by the storm buffeted the plane so that at one time an updraft lifted the plane about 5,000 feet. The testimony discloses that the plane also experienced unusual vibrations, which the pilot could not understand. These vibrations ceased when the plane cleared the storm area.

Shortly thereafter, however, the plane entered the storm area again, and again experienced the buffeting previously encountered, which continued and became quite violent, even after the plane had cleared the storm area. The pilot decided on an emergency landing because of the continuing severe and unusual vibrations of the plane, and he brought the plane down in a field of growing corn. The emergency landing was made with the landing gears retracted and at a speed of about one hundred and twenty miles an hour. It appears from the evidence that the plane slid along the ground for approximately 1,600 feet before it came to a stop. Friction caused by metal parts of the plane coming into contract with the corn stalks started a fire on the wing of the plane near the number four engine.

When the plane had come to a stop the passengers were evacuated without incident, and they walked to a barn nearby where they were given temporary shelter. They were later transported by bus to Baltimore and lodged in a hotel. The testimony discloses that none of the passengers was aware that an emergency landing was imminent. There is no evidence that any passenger was injured, nor that any passenger requested medical attention or first aid.

At his request the plaintiff's intestate was flown to Miami on another of defendant's planes, arriving in Miami early the following morning. He remained in Miami for three days, during which time he did not see a doctor. Plaintiff testified that decedent was "nervous; he was fidgety; he was very upset; he couldn't even eat." Decedent flew back to New York and on July 25, 1951, went to see a doctor. According to the testimony of Dr. Shookhoff, the doctor who examined him, decedent, in describing the emergency landing on July 19th stated he suffered no contusions or abrasions or injuries. Decedent told Dr. Shookhoff, however, that he was "under a severe nervous tension," had begun experiencing pain in the whole left side of his chest, and since the incident "is nervous, shaky, and does not feel secure."

Decedent again flew to Miami some time in August, 1951, to join his wife and son there. He returned to New York about two weeks later, again by plane. On or about September 28, 1951, he suffered a stroke, for which he was hospitalized, and remained hospitalized until his death on November 24, 1951. The evidence is that the final diagnosis after death was "diabetic acidosis and coma, bilateral pneumonia, cystitis with pyelonephritis, old left hemiplegia, gout, arteriosclerosis."

At the time of the accident in question, decedent had a pre-existing condition of diabetes milletus. He had a ten year history of gout, usually affecting his feet and sometimes his hand, from which infirmity he had about one attack a year; he also had been hospitalized in October, 1945, for about a month for a coronary thrombosis, diabetes and gout. He had again been hospitalized in June, 1946, for a week for coronary sclerosis, diabetes and gout; and he had also been in the hospital for about four days in October, 1946, for coronary thrombosis, diabetes milletus, arteriosclerosis and gout. Furthermore, the records show that decedent was taking medication for these various ailments to the time of his final hospitalization and death.

The death certificate, in evidence, states:

"I further certify that death was not caused directly or indirectly by accident, homicide, suicide, acute or chronic poisoning, or in any suspicious or unusual manner, and that it was due to Natural Causes more fully described in the confidential medical report filed with the Department of Health."

Upon examination of the plane after the accident it was observed that the hydraulic reservoir access door was open. In answers to interrogatories submitted to defendant before the trial it was said:

"On June 1, 1951, an Eastern Air Lines training flight presumably ex-

perienced an open hydraulic door during flight since the door was found unlatched after landing.

"On June 8, 1951 Eastern Air Lines Flight 503 encountered vibration during a thunderstorm. The hydraulic door cover was later found to have opened."

Portions of reports of certain tests conducted by defendant were also put into evidence:

"Eastern Air Lines' chief pilot for the Eastern Region ran a series of tests on June 1 immediately following the incident of that date, using the same aircraft. It was found that the buffeting which was caused by the hydraulic reservoir access door being opened during flight could be eliminated by extension of flaps. The details of these tests were transmitted to the chief engineering pilot on June 6, and it was suggested that further investigation be made of the matter.

"In his reply the chief engineering pilot stated in effect that many such malfunctions are encountered in flight test work and considered the matter of relatively minor importance. Therefore, it was not necessary to notify pilots."

The report continues:

"As a result of this accident (referring to the accident involved in the instant case) and the three previous incidents, a test flight was conducted as part of the investigation in an identical Constellation flown by the crew of Flight 601. Suitable means were provided for selective release of the fastener in flight. The crew concurred in the opinion that buffeting experienced on the test flight was of the same order which had occurred on Flight 601 (the flight on which plaintiff's intestate was a passenger at the time of the accident in question). With all four latches released, the trailing edge of the door rose and oscillated in the air stream. The induced buf-

feting was so severe that it was not allowed to continue for more than thirty seconds at any one time. Buffeting, it was found, could be eliminated entirely by the use of sixty per cent flaps."

As to the first cause of action for conscious pain and suffering, no Virginia statute has been pleaded as the basis for the action. In fact, plaintiff argues that she does not have to rely on Virginia law. It is her contention that she has the right to pursue her action for pain and suffering "under the New York Law based upon the breach of warranty of safe carriage."

■ From the facts adduced on the trial, it appears that the flight in question started at Newark Airport in New Jersey and was scheduled to terminate at Miami, Florida. There is no evidence, however, with respect to where decedent purchased his ticket. Therefore, there is no basis in fact for plaintiff's contention that New York law with respect to breach of warranty is applicable.

■ Even if it is assumed that the laws of New York apply, plaintiff is in no better position on the first cause of action. It appears well-established by decisions of the New York courts that it is immaterial whether the action is in form "ex contractu" for a breach of the carrier's contract or "ex delicto." Regardless of the form of the pleading, the decisions hold that the liability of a public carrier of passengers is referable to the question of its negligence. Webber v. Herkimer & M. St. R. Co., 109 N.Y. 311, 16 N.E. 358; Faron v. Eastern Airlines, Inc., 193 Misc. 395, 84 N.Y.S.2d 568. See also Maynard v. Eastern Airlines, Inc., 2 Cir., 178 F.2d 139, 13 A.L.R.2d 646. In the Faron case, supra, the court, 84 N.Y.S.2d at page 570, stated:

"Where, as here, the gravamen of the cause of action is an alleged breach of a duty through negligence, the action is governed by the applicable law of torts, even though the allegations refer to a breach of a contract."

█ █ It is a well-established principle of conflict of laws that the lex loci delicti is the applicable law governing liability for tortious acts. In the instant case, therefore, the law of Virginia governs the right of recovery here for conscious pain and suffering. McKinney v. Schuster, 202 Misc. 450, 110 N.Y.S.2d 74, is pertinent. The case arose out of an accident occurring in Virginia. The complaint, as here, alleged a cause of action for conscious pain and suffering as well as a cause of action for wrongful death. The court there had the following to say regarding the cause of action for conscious pain and suffering:

> "As to the second cause of action for conscious pain and suffering, no such action existed in this state at common law. It exists in this state now by virtue of statute. Decedents' Estate Law, §§ 118–120. Independent research does not indicate the existence of any such cause of action in Virginia either at common law or by statute, in addition to the cause of action for wrongful death. It must be presumed that the common law of Virginia is the same as ours. Southworth v. Morgan, 205 N.Y. 293 [294], 296, 98 N. E. 490, 491, 51 L.R.A.,N.S., 56. If such a cause of action exists under Virginia Law, it must be pleaded. Southworth v. Morgan, 205 N.Y. 293, 296, 98 N.E. 490, 491, 51 L.R. A.,N.S., 56. The complaint fails to do so and, therefore, fails to state a cause of action for conscious pain and suffering." 110 N.Y.S.2d at page 79.

█ The highest court of Virginia has ruled that if an injury results in death, there can be but one action, one verdict and one recovery, and that being solely for such damages as are found to be "fair and just" suffered by the next of kin. Brammer's Adm'r v. Norfolk & W. R. R. Co., 107 Va. 206, 57 S.E. 593. It would appear, therefore, that there is no right of recovery under the first cause of action.

As it has already been noted, plaintiff makes no claim to a right to recover under the first cause of action by virtue of the laws of Virginia.

With respect to the action for wrongful death, plaintiff has pleaded the Virginia death statute. Sec. 8–636, Code of 1950, Ch. 29, Article (3). Right of recovery is predicated "upon the condition that the facts are such that the deceased might have maintained the action, had he lived, for the injury resulting from the same act or omission." Virginia Electric & Power Co. v. Decatur, 173 Va. 153, 3 S.E.2d 172, 175, 4 S.E.2d 294.

The second cause of action alleges that by reason of the defendant's negligence "plaintiff's intestate was severely and seriously injured, bruised and wounded * * *."

It is evident from the testimony that shortly before the plane was forced down, it experienced considerable buffeting in the air. Captain Armstrong, the pilot of defendant's plane, testified:

> "It was vibrating so that I thought it would be better to have it on the ground than to have it in the air, it would be safer.
>
> * * * * * *
>
> "The airplane was warning me what it was going to do if I didn't get it on the ground immediately."

Furthermore, the testimony is that the plane was traveling at a speed of approximately one hundred and twenty miles when the emergency landing occurred; that during the landing, which was made with the landing wheels retracted, one of the propellers dug into the ground with sufficient force to cause the engine to be pulled out of its mounting. Defendant's pilot also testified that when the plane touched ground it tilted forward, and the forward part of the belly struck the ground before the plane settled back.

Captain Armstrong testified that the emergency landing was very smooth. However, from the foregoing evidence it is quite likely that the occupants of

the plane were at least shaken and jostled to some extent. Another passenger testified on behalf of the plaintiff that the plane "came to a very fast stop. —It just hit—with a great impact, tremendous impact."

As already noted, according to the testimony, although the incident of the emergency landing may have caused plaintiff's intestate nervous strain and tension he suffered no contusions or abrasions or injuries from the accident. There is, therefore, no evidence to support the allegations in the complaint that decedent was "injured, bruised and wounded." However, during the course of the trial, on plaintiff's motion, the complaint was amended and the following allegations added:

"That this aforesaid flight and crash landing did aggravate, enhance, and accelerate the plaintiff intestate's physical disability which pre-existed and that this thus did result in his death."

The question then, assuming the decedent's nervous strain was proximately caused by defendant's negligence, is whether there is a right of recovery under Virginia law for aggravation of pre-existing physical disabilities resulting from such nervous strain, but having no causal connection with physical injury.

The rule has been established in some jurisdictions that as long as physical impact is established there may be recovery for mental anguish and suffering unaccompanied by physical injury. The "impact rule" has been found satisfied by the most trivial of impacts. Homans v. Boston El. R. Co., 180 Mass. 456, 62 N.E. 737, 57 L.R.A. 291 (slight bump against the seat); Porter v. Delaware, L. & W. R. Co., 73 N.J.L. 405, 63 A. 860 (cinder in eyes).

■ Neither plaintiff nor defendant has cited any Virginia cases setting forth the law of Virginia with respect to liability for mental anguish. From independent research, however, it appears it is the rule in Virginia that mental anguish and suffering resulting from mere negligence, unaccompanied by injury to the person, cannot be made the basis of an action for damages. Chesapeake & Ohio Railway Co. v. Tinsley, 116 Va. 600, 82 S.E. 732, and cases cited. In that case the court, in ruling on certain instructions given by the trial court, stated, 116 Va. at page 603, 82 S.E. at page 733:

"* * * the fifth instruction, which authorizes a recovery for injuries alleged to have resulted from fright or mental shock having no causal connection with physical injury, ought not to have been given. The sixth instruction should also have been so modified as to exclude the impression that there may be a recovery from fright alone."

In Burlington Mills Corporation v. Hagood, 177 Va. 204, 13 S.E.2d 291, the highest court of Virginia ruled that an "accidental injury" exists within the Workmen's Compensation Act, Code 1936, § 1887(1) et seq., where an employee in the course of her employment receives a sudden shock or fright involving no physical impact but resulting in her disability. However, the court distinguished liability under workmen's compensation from liability for a tort under common law negligence. At page 293, of 13 S.E.2d the court stated:

"We are fully aware that in tort actions we have followed the common-law rule that there can be no recovery for mental anguish unaccompanied by physical injury * * *."

■■ From the foregoing decisions, therefore, it must be concluded that under Virginia law, in order to recover for disabilities resulting from nervous strain, it is not enough to show there was some physical impact. The nervous strain and mental anguish must be accompanied by actual physical injury.

In view of the foregoing, there must be a judgment for the defendant.

Findings of fact and conclusions of law in conformity with the foregoing opinion will be filed simultaneously herewith.